# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| The Humane Society of the United States<br>2100 L Street N.W.<br>Washington, DC  20037 | ) ) ) |
| Center for Biological Diversity<br>P.O. Box 710<br>Tucson, AZ  85702-0710 | ) ) ) ) |
| Friends of Animals and Their Environment<br>2170 St. Clair Avenue<br>St. Paul, MN  55105 | ) ) ) ) |
| Born Free USA<br>P.O. Box 22505<br>Sacramento, CA  95822 | ) ) ) ) |
| Help Our Wolves Live<br>4901 Second Avenue S.<br>Minneapolis, MN  55419, | ) ) ) ) |

Civil No. _____

Plaintiffs,

v.

Ken Salazar, Secretary of the Interior
Department of the Interior
1849 C Street N.W.
Washington, DC  20240

United States Department of the Interior
1849 C Street N.W.
Washington, DC  20240

United States Fish and Wildlife Service
1849 C Street, N.W.
Washington, DC  20240,

Defendants.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiffs, a coalition of animal protection and conservation organizations, challenge the decision of the United States Fish and Wildlife Service ("FWS") to remove protections of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, from gray wolves in the Great Lakes region.

2.      Shielded from the unrestrained killing that drove it to the brink of extinction, the gray wolf has started its recovery in the Great Lakes region.  Yet even today, the gray wolf is present across just five percent of its historic range.  Because the statutory mandates of the ESA prohibit delisting at this time, the FWS has tried to sidestep the Act by using a legal tool designed to <u>increase</u> species protection – the "distinct population segment," or DPS – for delisting purposes.

3.      The agency has simultaneously created and delisted the "western Great Lakes DPS," even though this population was not previously listed under the ESA.  Congress envisioned that DPS designations would be used to protect locally vulnerable populations of species that are otherwise abundant.  Neither the ESA nor its implementing policies contemplate that a DPS could be used to prematurely delist a species.  If the FWS's scheme is allowed to succeed, the FWS would be able to effectively delist <u>any</u> endangered species whose remaining populations exist in isolated pockets.

4.      The FWS's misuse of the DPS tool has been invalidated by four separate federal district courts.  Most recently, in September 2008, this Court vacated the FWS's 2007 rule that designated and delisted the western Great Lakes DPS.  The Court found that the "FWS has misread the statute" and remanded to the agency for further explanation, including explanation as to how the agency's interpretation might undermine the ESA's policy objectives.  *Humane Soc'y*

2

*of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 14 n.8 (D.D.C. 2008). This decision restored federal protections to wolves in the Great Lakes region.

5.     On January 14, 2009, less than four months after the wolf regained the ESA's protections, the FWS announced its decision to again designate and delist a western Great Lakes DPS. On April 2, 2009, the final rule that is the subject of this Complaint was published in the Federal Register. 74 Fed. Reg. 15070 (April 2, 2009) (hereinafter "Delisting Rule").

6.     The Delisting Rule is nearly identical to the rule vacated by this Court in 2008 and suffers from the same defects. In addition, the FWS refused to open the rulemaking to public comment, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. The FWS also failed to address any of the new scientific and commercial data regarding threats to wolves, and failed to address one of the specific issues in this Court's Opinion remanding the previous rule to the agency.

7.     Because the Delisting Rule violates federal law, The Humane Society of the United States, Center for Biological Diversity, Friends of Animals and Their Environment, Born Free USA, and Help Our Wolves Live (collectively, "Plaintiffs") bring this action against Secretary of the Interior Ken Salazar, the Department of the Interior, and the FWS (collectively, the "FWS"). Plaintiffs seek a declaration that the Delisting Rule violates the ESA, the APA, and this Court's Opinion and Order. Plaintiffs also seek an injunction to prevent implementation of the rule and an order vacating the rule.

## JURISDICTION AND VENUE

8.     Plaintiffs bring this action pursuant to the ESA's citizen-suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. §§ 702, 704. This Court has jurisdiction pursuant to 28 U.S.C.

§ 1331 because this action arises under United States law. It may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

9.      Venue is proper in this judicial district because the defendants reside in and the violation occurred in the District of Columbia. *See* 28 U.S.C. § 1391(e); 16 U.S.C. § 1540(g)(3)(A).

## PARTIES

10.     Plaintiff The Humane Society of the United States ("The HSUS") is a non-profit charitable organization incorporated in 1954. The HSUS is the largest animal protection organization in the world, with over 11 million members and constituents. Its mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. The HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species and their habitats. The HSUS has long been an active advocate for wolf protection and recovery. Its members enjoy studying, photographing, and viewing wildlife in their natural habitat, including wolves, and these members place great importance on appreciating wolves in the wild. The HSUS's members have attended meetings on wolf management held by state and federal agencies and other interested parties. The HSUS and its members regularly submit comments to governmental agencies on issues affecting animals, including wolves.

11.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit organization that was founded in 1989 and has over 40,000 members. The Center is dedicated to securing a future for all species hovering on the brink of extinction and is actively involved in species and habitat protection issues. The Center has long been an active advocate for wolf protection and recovery. Its members enjoy studying, photographing, and viewing wildlife, such

4

as wolves, in their natural habitat. The Center and its members regularly submit comments to governmental agencies on issues affecting wildlife, including wolves.

12.     Plaintiff Friends of Animals and Their Environment ("FATE"), a Minnesota non-profit organization established in 1976, is committed to the protection of animals and the ecosystems on which they depend. FATE, which has approximately 200 members and supporters, regularly advocates on behalf of animals, and in particular wolves, through public education and political lobbying. FATE's members and supporters enjoy monitoring and observing wolves in the wild. FATE and its members submit comments to governmental agencies on issues affecting animals, including wolves.

13.     Plaintiff Born Free USA, originally founded in 1968, is a national non-profit organization working to alleviate the unnecessary suffering of wild animals in captivity, rescue individual animals in need, protect wildlife – including highly endangered species – in their natural habitats, and encourage compassionate conservation globally. Born Free USA has tens of thousands of members and supporters living throughout the country. Born Free USA's work includes monitoring and studying the impacts of agency actions on animals, including wolves and other carnivores. One of Born Free USA's principal campaigns focuses on wildlife protection, and Born Free USA uses education and other methods to protect wild animals and their habitat. Its members enjoy studying, photographing, and viewing wildlife in their natural habitat, including wolves. In recent years Born Free USA has been actively involved in efforts aimed at wolf protection and recovery. Born Free USA and its members regularly submit comments to governmental agencies on issues affecting animals, including wolves.

14.     Plaintiff Help Our Wolves Live ("HOWL"), a Minnesota non-profit organization founded in 1969, is an advocacy group whose purpose is to work for the protection and

5

preservation of the gray wolf and other endangered species. HOWL's members enjoy observing and monitoring Minnesota's wolf population. HOWL uses education and science to discourage human activities that adversely affect wildlife, and HOWL has provided comments to government agencies concerning proposed actions that would affect wild animals, such as wolves.

15.     The plaintiff organizations and their members are deeply committed to wolves. Plaintiffs seek to protect and recover gray wolves through a wide array of actions including public education and advocacy. Members of the plaintiff groups seek to view wolves and signs of wolves in the wild throughout the Great Lakes region. Implementation of the Delisting Rule will result in fewer wolves within the region and will reduce the members' opportunities to experience wolves.

16.     Moreover, the plaintiff organizations and their members were denied any opportunity to comment on the Delisting Rule. A public comment period would have allowed them to identify scientific or commercial data newly available since publication of the vacated rule, address a new plan and new laws governing state management of wolves in Michigan, and offer their analysis of the issues that the Court remanded to the agency for explanation. Consequently, the agency did not receive important information on wolves, and the plaintiff organizations and their members did not receive the benefit of the agency's consideration of that information. As such, Plaintiffs and their members have experienced procedural injury from the unlawful promulgation of the Delisting Rule.

17.     Because the Delisting Rule will reduce Plaintiffs' opportunities to experience wolves, and because Plaintiffs were denied the opportunity to participate in the agency's rulemaking, the legal violations alleged in this Complaint cause direct injury to the aesthetic,

conservation, recreational, scientific, educational, and wildlife preservation interests of the plaintiff organizations and their members.  Plaintiffs' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests have been, are being, and, unless their requested relief is granted, will continue to be, adversely and irreparably injured by the FWS's failure to comply with federal law.  These are actual, concrete injuries, traceable to the FWS's conduct that would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

18.      Defendants Secretary of the Interior Ken Salazar, the United States Department of the Interior, and the United States Fish and Wildlife Service are charged with the administration of the Endangered Species Act.  The defendants are responsible for ensuring the protection and recovery of species listed as endangered or threatened under the ESA.  They are sued in their official capacities.

## LEGAL FRAMEWORK

### *The Endangered Species Act*

19.      The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species."  16 U.S.C. § 1531(b).

20.      Under the ESA, the Secretary of the Interior, acting through the FWS, must list all species determined to be "endangered species" and "threatened species."  *Id.* § 1533(c)(1).

21.      The Act defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  Similarly, the Act defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

22.     The "significant portion" of the range (as used in the definitions of "endangered species" and "threatened species") includes major geographical areas where the species was once present, regardless of whether the species currently exists in those areas. *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 20 (D.D.C. 2002).

23.     Once a species becomes listed, it enjoys the aggressive protections of the ESA. The most fundamental protection is the prohibition on taking and trafficking of endangered species. 16 U.S.C. § 1538(a)(1). To facilitate species recovery, the ESA requires the FWS to designate and protect critical habitat, *Id.* § 1533(a), and to develop and implement recovery plans for listed species. *Id.* § 1533(f). Moreover, the Act requires all federal agencies to "utilize their authorities" in furtherance of the purposes of the ESA. *Id.* § 1531(c)(1). Every federal agency is required to ensure that its actions are not likely to "jeopardize the continued existence" of any endangered species or threatened species or "result in the destruction or adverse modification" of a species' designated critical habitat. *Id.* § 1536(a)(2).

24.     Under Section 4 of the ESA, 16 U.S.C. § 1533, the FWS must list a species if the agency determines that the species is endangered or threatened due to any of the following factors:

     A.  the present or threatened destruction, modification, or curtailment of its habitat or range;

     B.  overutilization for commercial, recreational, scientific, or educational purposes;

     C.  disease or predation;

     D.  the inadequacy of existing regulatory mechanisms; or

     E.  other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1) (hereinafter "the five factors").

25.     All listing decisions under the ESA -- whether to list, reclassify, or delist -- must be based solely upon "the best scientific and commercial data available." *Id.* §§ 1533(b)(1)(A), (c)(2).

26.     A species can be delisted only if the species is neither endangered nor threatened because it is extinct, because it has recovered, or because the original listing decision was in error. *See* 50 C.F.R. § 424.11(d).  A species can be delisted based on recovery only if it is no longer endangered or threatened under the five factors.  16 U.S.C. § 1533(c)(2)(B); *see also* 50 C.F.R. § 424.11(d)(2).

27.     The FWS cannot change the status of a listed species without an analysis of threats to the species using the five factors.  16 U.S.C. §§ 1533(b)(1)(A), (c)(2).

### *The Distinct Population Segment Policy*

28.     The ESA broadly defines a "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16) (emphasis added).

29.     Under this definition, the FWS can list a distinct population segment ("DPS") of a vertebrate species when the species as a whole is neither endangered nor threatened.  *See, e.g.,* 68 Fed. Reg. 10388 (Mar. 5, 2003) (listing the Columbia Basin distinct population segment of the pygmy rabbit but not listing the species as a whole).

30.     In 1996, the FWS, together with the National Marine Fisheries Service, adopted a policy for determining when DPSs can be designated under the Act.  61 Fed. Reg. 4722, 4725 (Feb. 7, 1996) (hereinafter "DPS Policy").

31.     Congress envisioned that DPS designations would be used to protect locally vulnerable populations of species that are otherwise abundant.  The DPS Policy explains that by

9

extending the protections of the ESA to locally-vulnerable populations, DPSs "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range." *Id.* at 4725.

32.     The FWS must consider three elements in any decision regarding the status of a DPS under the ESA.  These elements are:

     a.   Discreteness of the population segment in relation to the remainder of the species to which it belongs;

     b.   The significance of the population segment to the species to which it belongs; and

     c.   The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

*Id.*

33.     To determine the conservation status of the DPS, the DPS must be evaluated "for endangered or threatened status . . . based on the Act's definitions of those terms and a review of the [five] factors enumerated in [16 U.S.C. § 1533(a)]." *Id.*

### The Administrative Procedure Act

34.     The rulemaking provisions in the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, generally require that notice of proposed rules be published in the Federal Register and that "interested persons" be given the "opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. §§ 553(b), (c).

35.     The APA provides for judicial review of final agency action such as the Delisting Rule.  Under the APA, a reviewing court must hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

### *Gray Wolf Biology*

36.     The gray wolf (*Canis lupus*) is the largest member of the canine family.  Wolves prey primarily on wild ungulates such as deer, elk, and moose, as well as smaller mammals like beaver and rabbits.  Wolves are habitat generalists, and if they are not persecuted by humans, they can live anywhere that contains a sufficient population of large ungulates.

37.     Wolves are social animals and wolf pups are dependent upon family units, or packs, for their survival.  The pack itself usually consists of a dominant pair, their pups, and several other subordinate or young animals.  The dominant pair leads the pack in hunting, finding den sites, and establishing the pack's territory.  Wolf pups remain with their parents for at least the first year of life, while they learn to hunt.  After that, these yearlings typically leave the pack to find mates and territories of their own.

38.     The process of traveling to establish a new territory is called dispersal.  Dispersal is essential to the viability and recovery of the gray wolf.  Dispersing wolves find mates in disparate geographic areas, which helps maintain the genetic diversity of the species.  Dispersing wolves are key to wolf recovery because they are needed to recolonize areas in which wolves were previously eradicated.

39.     The only gray wolf population in the conterminous United States east of the Rocky Mountains is found in Minnesota, Wisconsin, and the Upper Peninsula of Michigan. According to the FWS, this population holds about 80 percent of North American gray wolves that occur south of Canada.  74 Fed. Reg. at 15079.

40.     Historically, wolves ranged across nearly all of North America, including the entire Great Lakes region.

### *The Ecological Significance Of The Gray Wolf*

41.     The ecological benefits of gray wolf recovery are well-documented in the scientific literature.  Numerous studies have shown that the loss of an apex predator species, like the wolf, has ripple effects throughout the ecosystem that may lead to reduced biodiversity.  As such, wolf recovery effectuates the ESA's broader goal of preserving functioning ecosystems. *See* 16 U.S.C. § 1531(b).

42.     For example, the elimination of the wolf throughout much of its historic range contributed to an explosion in numbers of coyotes across the United States.  Coyotes now occupy most of the wolf's historic range, and the invasion of coyotes has contributed to the decline of other species, such as the swift fox.

43.     Wolf recovery has helped restore natural predator-prey dynamics.  These effects have been seen in the Great Lakes region, where the migration of wolves to Michigan's Isle Royale National Park corrected an overpopulation of moose that was damaging the Park's plant communities.

44.     Similarly, the ecology of Yellowstone National Park and surrounding areas has improved since the reintroduction of the wolf in the mid-1990s.  In Yellowstone, the reintroduced wolves have changed the grazing behavior of elk and other ungulates along the region's waterways, thus allowing several tree species, including willow and cottonwood, to recover from over-browsing.  The recovery of vegetation in turn bolstered biodiversity by creating shelter and habitat for beavers and songbirds, and by increasing potential trout habitat.

45.     Wolves also benefit scavenger species such as bears, badgers, and eagles, which are provided with a reliable food source year-round from the "leftovers" of wolf kills.

### *The Wolf Is Persecuted To The Brink Of Extinction*

46.     The gray wolf once existed throughout most of North America.  But as agricultural development spread, wolves became the subject of persecution.  State and local governments authorized bounties and the federal government employed salaried hunters with the goal of eliminating the gray wolf.  These combined efforts almost eradicated the wolf from the 48 conterminous United States.

47.     This trend was reflected in the Midwest.  In the Dakotas, wolves were extirpated by the 1920s or 1930s.  And by 1960, the wolf had been eliminated from Wisconsin and Michigan.  Despite the wolf's diminishing range in Minnesota, public bounties were paid up until 1965, and wolves could be legally killed until the 1970s.  By the early 1970s, the only gray wolves living within the conterminous United States consisted of an isolated population in Isle Royale National Park and a population of several hundred wolves in remote areas of northern Minnesota.

### *The Wolf's Recovery Begins*

48.     The gray wolf was one of the first species to be listed under the Endangered Species Preservation Act of 1966, the forerunner of the ESA.  32 Fed. Reg. 4001 (Mar. 11, 1967).  But these legal protections were limited, and it was the 1973 passage of the ESA that introduced the first serious protection for the wolf.  Soon after the Act's passage, the FWS listed several subspecies of gray wolf, including the eastern timber wolf.  Due to administrative difficulties created by the various subspecies listings, the FWS decided to relist the gray wolf. Accordingly, in 1978 the FWS listed the gray wolf as endangered throughout the conterminous United States and Mexico, except in Minnesota, where wolves were listed as threatened.  43 Fed. Reg. 9607 (Mar. 9, 1978).  Notably, at the time of listing, the only major population of the gray

13

wolf remaining anywhere in the 48 conterminous United States was in northern Minnesota. *Id.* at 9610. The listing was therefore predicated on the idea that wolves could eventually recolonize the states that lacked wolf populations but were part of the wolf's historic range.

49.     Once protected by the ESA, the Great Lakes wolf population began reoccupying portions of its historic range. Between 1979 and 1998, the occupied wolf range in Minnesota more than doubled. Meanwhile, wolves began dispersing from Minnesota into northern Wisconsin, and from there into the Upper Peninsula of Michigan. Wisconsin first reported a wolf pack in 1975, and Michigan recorded a breeding pair in 1991. Today, there are wolves in all three states, though the vast majority of the Great Lakes wolf population remains in northern Minnesota. *See* 74 Fed. Reg. at 15071-72.

50.     The gray wolf has now reoccupied a small portion of its historic range. At the time of the ESA's passage, the gray wolf had been reduced to less than one percent of its historic range within the conterminous United States. Since then, the wolf has returned to approximately five percent of its range. Despite this limited progress, the gray wolf remains extirpated across the vast majority of its historic range, both within the Great Lakes region and nationwide.

### The FWS's Previous Efforts To Reduce Protections For Wolves

51.     Since the gray wolf's listing, the FWS has undermined ESA protections for the wolf on several occasions, thereby necessitating judicial intervention. In the 1970s, the FWS authorized an aggressive trapping program in northern Minnesota, which resulted in the take of 151 wolves over a four-year period before a court stopped the practice. *See Fund for Animals v. Andrus*, Civ. No. 5-78-66, 11 Env't Rep. Cas. (BNA) 2189, 2191, 2200-01 (D. Minn. 1978). In the 1980s, the FWS authorized sport trapping of wolves in Minnesota. Again, the courts

reversed the agency, finding that the sport trapping of threatened wolves violates the ESA.

*Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir. 1985).

52.     Over the last decade, the FWS has been determined to prematurely remove

protections from the gray wolf by misusing the DPS tool.  The FWS's first attempt involved

dividing the gray wolf's range into three large DPSs and downlisting almost all wolves to

threatened status.  *See* 68 Fed. Reg. 15804 (April 1, 2003).  Two federal courts independently

struck down this rule.  *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d

1156 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005).  By

vacating the rule, these decisions restored the gray wolf to endangered status throughout the

conterminous United States, except in Minnesota, where the wolf remained threatened.

53.     After the wolf's return to endangered status, the FWS issued permits to Wisconsin

and Michigan allowing the states to kill up to 54 wolves in 2005.  This Court invalidated those

permits because the FWS had failed to provide notice and an opportunity for public comment

before issuing them.  *Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civ.

No. 05-1573-ESH (D.D.C. Sept. 13, 2005).  The day following the ruling, Wisconsin's

resubmitted permit application was published in the Federal Register, and in April 2006 the FWS

issued a new permit allowing Wisconsin to take 43 wolves in 2006.  This Court again enjoined

implementation of the permit, finding that this lethal take of endangered wolves was not

authorized by the ESA.  *Humane Soc'y of the U.S. v. Kempthorne*, 481 F. Supp. 2d 53 (D.D.C.

2006), *vacated as moot by* 527 F.3d 181 (D.C. Cir. 2008).

54.     Meanwhile, the agency resumed its campaign to prematurely remove federal

protection from the wolf through misuse of the DPS tool.  The agency issued two rules that

created DPSs within the nationwide species-level listing of the gray wolf.  These rules

15

simultaneously designated and delisted the western Great Lakes DPS and the northern Rocky

Mountains DPS. *See* 72 Fed. Reg. 6052 (Feb. 8, 2007) (western Great Lakes); 73 Fed. Reg.

10514 (Feb. 27, 2008) (northern Rocky Mountains). The effect of these rules was to remove the

Act's protections from almost all wolves in the conterminous United States.

     55.    A coalition of animal protection groups, which included many of the Plaintiffs in

this action, challenged the delisting of wolves in the Great Lakes region. This Court struck down

the rule in September 2008. *Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7

(D.D.C. 2008). Another federal court enjoined the rule delisting the northern Rocky Mountains

DPS. *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008).

     56.    In vacating and remanding the delisting of the western Great Lakes DPS, this

Court explained that the ESA does not clearly address whether the FWS can designate a sub-

population of a listed species as a DPS and then delist that sub-population, even if that sub-

population had not been recognized as a DPS or listed beforehand. The Court found that no

deference was due to the agency because the "FWS has misread the statute." 579 F. Supp. 2d at

14, n.8. The Court questioned the agency's use of the DPS tool, and stated that the text of the

ESA "quite strongly suggests – consistent with common usage – that the *listing* of any species

(such as the western Great Lakes DPS) is a precondition to the *delisting* of that species." *Id.* at

17. The Court remanded to the FWS to provide a thorough explanation for its interpretation of

the ESA, including how its interpretation might undermine the ESA's policy objectives. *See id.*

at 20-21.

     57.    In response to the ruling from this Court (and in response to the decision that

enjoined the northern Rocky Mountains DPS), the FWS reinstated protections to the gray wolf.

73 Fed. Reg. 75356 (Dec. 11, 2008).

### The Agency Rushes To Issue Another Delisting Rule

58.     On December 12, 2008, the Office of the Solicitor for the Department of the Interior released an opinion trying to defend the FWS's decision to simultaneously designate and delist the western Great Lakes DPS.  About one month later, the FWS announced in a press release its intention to publish rules that would again delist wolves in the western Great Lakes and northern Rocky Mountains.  *See* U.S. Fish & Wildlife Service, *Service removes Western Great Lakes, Portion of Northern Rocky Mountain Gray Wolf Populations from Endangered Species List* (Jan. 14, 2009), *available at* http://www.fws.gov/midwest/wolf/.

59.     On April 2, 2009, the Delisting Rule that is the subject of this Complaint was published in the Federal Register.  *See* 74 Fed. Reg. 15070.  The Delisting Rule simultaneously designates and delists the western Great Lakes DPS – just as did the rule vacated by this Court. In a separate rulemaking issued the same day, the FWS designated and delisted wolves in the northern Rocky Mountains.  74 Fed. Reg. 15123 (Apr. 2, 2009).  Once again, the FWS has removed protections of the ESA from almost all of the gray wolves in the conterminous United States.

60.     In its rush to delist wolves in the Great Lakes, the FWS refused to provide the public an opportunity to comment on the Delisting Rule.

### The Agency's Additional Rationale Does Not Justify Its Misuse Of The DPS Tool

61.     The Delisting Rule (and the related opinion by the Office of the Solicitor) offers additional, but still unconvincing, rationale in support of the agency's misuse of the DPS tool. Dismissive of much of the Court's reasoning, the FWS continues to argue that the ESA gives the FWS clear authority to simultaneously designate and delist the western Great Lakes DPS.

62.     This Court specifically mandated that the FWS "address any legitimate concerns that its interpretations could undermine [the ESA's] policy objectives." 579 F. Supp. at 20-21.

63.     The Delisting Rule does not address how the FWS's interpretation of the ESA could undermine the Act's policy objectives.

64.     The FWS cannot use the DPS tool to encircle and delist the only two gray wolf populations in the conterminous United States that have made any substantial progress towards recovery. This tactic could be used to justify delisting virtually any species – no matter how endangered – whose remaining populations are clustered within a discrete area. Such a scheme undermines the ESA's purpose of conserving endangered species and the ecosystems on which they depend. 16 U.S.C. § 1531(b).

65.     The ESA and the DPS Policy are designed such that distinct population segments may be designated and used to protect a locally-imperiled population of an otherwise viable species. Indeed, the DPS Policy's requirement that a DPS must be significant and discrete only makes sense when applied in the context of the listing of a locally-imperiled population as a DPS.

66.     Through a semantic sleight of hand, the agency has designated the western Great Lakes DPS to avoid its obligations to the larger, species-level listing. In the Delisting Rule, as with its prior delisting effort, the FWS only analyzed the status of wolves within the western Great Lakes, and entirely ignored the fact that the wolf as a whole remains critically endangered.

*The Delisting Rule Suffers From The Same Defects Previously Identified By Plaintiffs*

67.     Little difference exists between the Delisting Rule and the rule vacated by this Court. The Delisting Rule reaches the same result and is nearly identical in its analysis of threats to wolves. As such, the Delisting Rule suffers from the same defects previously identified by

18

Plaintiffs.  Beyond the agency's misguided attempt to use the DPS to prematurely delist the gray wolf, the Delisting Rule violates the ESA because (a) the boundaries of the DPS are unreasonable; and (b) the statutory criteria for delisting wolves in the Great Lakes have not been satisfied.

68.     The boundaries of the western Great Lakes DPS reach far beyond the current distribution of the wolf, removing federal protection from areas where the wolf remains extirpated.  Although wolves are found in only parts of Minnesota, Wisconsin, and Michigan, the western Great Lakes DPS includes the entirety of these states, as well as portions of six other states.

69.     To escape the confines of the DPS and reach a protected area, wolves must travel hundreds of miles across a "wolf movement zone," within which states and individuals have broad authority to kill dispersing wolves.  These expansive boundaries sever crucial dispersal corridors leading from the core population to unoccupied portions of the historic range.  The FWS does not adequately explain why these areas of suitable wolf habitat should be included within the DPS and removed from areas available for protection of wolves.

70.     If these DPS boundaries are allowed to stand, wolves would rarely, if ever, be able to disperse from the core population into areas that nominally retain an endangered listing. Thus, the broad DPS boundaries frustrate the effectiveness of the continued listed status of wolves outside the DPS.  As a result, there is little prospect of restoring this top predator to additional ecosystems, including significant portions of the wolf's historic range.

71.     The ESA requires that the agency draw the DPS boundaries much more narrowly, so that dispersing wolves can be protected under the Act and can recolonize additional portions of the wolf's historic range.

72.     The Delisting Rule is also illegal because wolves within the western Great Lakes DPS remain threatened from inadequate regulatory mechanisms, human predation, and disease. 16 U.S.C. § 1533(a)(1)(C)-(D).

73.     Under the ESA, delisting is improper when existing regulatory mechanisms are inadequate. 16 U.S.C. § 1533(a)(1)(D). In this case, the states have not provided sufficient protections for the gray wolf.

74.     The states do not have the financial resources needed to protect and monitor the wolf. Wolf management programs require considerable resources. Until recently, many of these costs were borne by the federal government under the auspices of the ESA. But with delisting, this source of federal funds will dry up, and the states will have to fund their own management programs. 74 Fed. Reg. at 15088.

75.     The Delisting Rule "rel[ies] heavily on the State wolf management plans for [its] assessment of the degree of protection and monitoring that will occur after Federal delisting," 74 Fed. Reg. at 15088, and the Rule blithely assumes that these "plans will be funded and implemented largely as written." *Id.*

76.     Given the financial crisis faced by state governments, there is mounting evidence that the states will be unable to afford to monitor the status of wolves or enforce the minimal protections for wolves provided by the state plans. This is particularly troubling given that heightened law enforcement "will be crucial in ensuring that illegal mortality does not significantly increase following Federal delisting." 74 Fed. Reg. at 15104.

77.     Even if the state management programs were fully funded and implemented, the gray wolf would not be adequately protected under state law. Most states within the DPS have no management plans at all (i.e. North Dakota, South Dakota, Iowa, Illinois, Indiana, Ohio).

Even those states that do have management plans fail to protect the wolf (i.e. Minnesota, Wisconsin, Michigan).

78.    Landowners throughout most of Minnesota now have enormous discretion to kill wolves, even when there is no immediate threat to livestock or domestic pets. The Minnesota management plan even resurrects the old "bounty system" by paying state-certified private predator controllers $150 for each wolf killed, creating an incentive to kill wolves without adequate justification. Likewise, the management plans in Wisconsin and Michigan significantly liberalize the conditions under which wolves can be killed. All three state management plans recognize the possibility of a public wolf harvest in the future. These state plans thus pose a serious threat to the wolf.

79.    The inadequacies of state management compound other threats to the gray wolf. For example, without adequate law enforcement, illegal wolf killings will likely surge. Even when wolves were protected under the ESA, human-caused deaths thwarted the wolf's recovery. In Wisconsin, approximately half of the deaths of radio-collared wolves have come from human causes, such as vehicle accidents and illegal trapping and shooting. Similar figures have been reported for Minnesota and Michigan. But instead of addressing these problems, the Delisting Rule aggravates them by lifting the protections of the ESA.

80.    State management also increases the risk that disease will decimate wolf populations. Without adequately funded monitoring programs, the wolf remains vulnerable to a catastrophic population loss from diseases like mange and canine parvovirus. *See* 74 Fed. Reg. at 15097. Indeed, in recent years, mange has killed as many wolves in Wisconsin as illegal shooting. The lack of identified resources for state-level monitoring throughout the DPS creates a risk that such problems will go unnoticed and unaddressed.

81.     In attempt to justify the delisting, the FWS relies heavily on the Recovery Plan for the Eastern Timber Wolf.  This plan, which was issued in 1978 and revised in 1992, focuses on the eastern timber wolf (*Canis lupus lycaon*), a subspecies that lost relevance as a listed entity when the FWS listed the gray wolf at the species level in 1978.  While the numerical goals may have been achieved, the broader goals of the recovery plan remain unfulfilled.  The FWS has made no attempt to restore the wolf to "as much of its former range as is feasible."  Nor has the FWS made any effort to reestablish wolves in the Adirondack Mountains, New Hampshire, or Maine, which are areas that the recovery plan identified for wolf restoration.

### The FWS Failed To Address Additional Threats To Wolves That Scientists Identified After Publication Of The Prior Delisting Rule

82.     In the Delisting Rule, the FWS continues to rely upon its analysis of threats to wolves that was included in the vacated rule.  That analysis is outdated because of changed circumstances.  Indeed, the Delisting Rule discusses none of the scientific or commercial data that has been published since 2007.

83.     First, the FWS failed to analyze in the Delisting Rule two state laws passed in 2008 that liberalize the control of wolves in Michigan.  *See* MICH. COMP. LAWS §§ 324.95153, 324.95163.  These laws result in a significant weakening of the protections for wolves provided by the Michigan wolf management plan that was approved in July 2008.

84.     Second, as mentioned above, the FWS failed to consider data indicating that there may be inadequate funding for monitoring and enforcement given the budget crisis faced by state governments.  As a consequence, the wolf population could be decimated by disease, illegal killings, and other threats before the FWS would even learn of the need for corrective action.

85.     Third, the FWS completely ignored the threat to the gray wolf posed by hybridization with coyotes.  A recent study has concluded that gray wolves have not been

restored to the Great Lakes because the Great Lakes wolf population suffers from widespread hybridization with coyotes.  Jennifer A. Leonard & Robert K. Wayne, *Native Great Lakes Wolves Were Not Restored*, Biol. Lett. 4: 95-98 (2008).  The threat from hybridization should have been considered when the agency assessed the status of Great Lakes wolves under the five factors.  *See* 16 U.S.C. § 1533(a)(1)(E) ("other natural or manmade factors affecting its continued existence").  Widespread hybridization also suggests that the population estimates that the FWS relied upon in making its delisting decision are grossly inflated.

86.     Fourth, the agency failed to consider scientific evidence that another wolf species (*Canis lycaon*) may be present within the boundaries of this DPS.  *See* L.D. Mech & W.J. Paul, *Wolf Body Mass Cline Across Minnesota Related to Taxonomy?*, 86 CANADIAN JOURNAL OF ZOOLOGY 933 (Aug. 1, 2008).  If some Great Lakes wolves are in fact members of a different wolf species, then the FWS overestimated the number of gray wolves in the Great Lakes.  In addition, the possibility of another wolf species further calls into question whether the boundaries of the western Great Lakes DPS are sufficiently tied to the distribution of gray wolves on the ground.  Until the FWS analyzes the possibility of presence of a similar but entirely distinct wolf species – a species whose status is likely even more precarious than that of the gray wolf – it is unreasonable to remove protection from all wolves within the western Great Lakes.

87.     By continuing to rely upon its analysis from the vacated rule that was published over two years ago, and failing to consider additional threats to wolves that scientists have identified since the publication of that rule, the FWS has violated the ESA's mandate that listing decisions be based on the best available scientific and commercial data.  16 U.S.C. §§ 1533(b)(1)(A), (c)(2).

88.     Because delisting the western Great Lakes wolf population is unlawful, on April 2, 2009, Plaintiffs sent a 60-day notice letter advising the agency of their intent to sue unless the FWS rescinded the Delisting Rule. *See* 16 U.S.C. § 1540(g)(2)(A).  The agency has not done so.

### COUNT I
### (Violations of the ESA and the APA)

89.     Plaintiffs restate and incorporate the foregoing allegations.

*The FWS cannot simultaneously designate and delist the western Great Lakes DPS*

90.     The ESA does not permit the FWS to use the DPS tool to remove protections of the Act from a population of a listed species if that population was not designated as an endangered or threatened DPS beforehand.

91.     The ESA and the DPS Policy direct that DPSs be designated "to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  61 Fed. Reg. at 4725.  Congress never intended that a DPS could be used to prematurely delist a species.

92.     The FWS has rarely – and only very recently – used the DPS tool to decrease species protection.  Previous species that the agency has declared recovered were generally widely distributed across the historic range at the time of delisting.  The FWS has failed to provide an adequate explanation for this change in agency position.

93.     The Delisting Rule is also arbitrary and capricious because the FWS failed to adequately explain the agency's departure from its previous determination that threats to the gray wolf warranted listing throughout the conterminous United States, despite a known population center in the Great Lakes.

94.     By creating a DPS for delisting purposes, the Delisting Rule violates the APA, the ESA, and the DPS Policy.

*The boundaries of the DPS are arbitrary and capricious*

95.     The Delisting Rule violates the APA, the ESA, and the DPS Policy because the boundaries of the western Great Lakes DPS are arbitrary and capricious.  These boundaries hinder recovery of the gray wolf throughout its historic range and include large areas in which the wolf remains extirpated.  Further, the FWS failed entirely to reconcile the current DPS boundaries, drawn with an eye toward eliminating protections for gray wolves, with the ecological and genetic criteria on which the agency relied in its DPS Policy.

*The FWS failed to assess threats to the wolf across a significant portion of its range*

96.     Before any change to the status of a species can be made, the FWS must analyze threats to that species pursuant to the five factors.  16 U.S.C. §§ 1533(b)(1)(A), (c)(2).

97.     The previous listing covered the conterminous United States, but in the Delisting Rule the FWS only analyzed threats to wolves within the DPSs it created.  The FWS failed to adequately explain why the conterminous United States is no longer the appropriate geographic context for measuring the gray wolf's condition.

98.     By failing to assess threats to wolves outside the DPSs and by changing the status of the gray wolf species despite its absence throughout a significant portion of its range, the Delisting Rule violates the ESA.

99.     Because the Delisting Rule violates the ESA and its implementing regulations and policies, the Delisting Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

*Wolves in the Great Lakes do not satisfy the statutory criteria for delisting*

100.    The ESA and its implementing regulations provide that a species has not recovered – and cannot be delisted – until the species is no longer threatened or endangered under the five listing factors of 16 U.S.C. § 1533(a)(1).  16 U.S.C. § 1533(c)(2)(B); 50 C.F.R. § 424.11(d)(2).

101.    The Delisting Rule violates the ESA and its implementing regulations because of the following threats to wolves in the Great Lakes:

a)    The gray wolf faces severe threats from disease and human predation.

b)    Without the ESA, the regulatory mechanisms protecting the gray wolf are inadequate.  Few states have plans or laws governing wolf management, and those states that have wolf management plans and laws fail to adequately protect existing wolf populations.

c)    There are other manmade factors affecting the gray wolf's continued existence and recovery.  Hybridization with coyotes is one such threat to wolves.

*The Delisting Rule is not based on the best available scientific and commercial data*

102.    The ESA and its implementing regulations require that listing and delisting decisions be made solely on the basis of the best scientific and commercial data available.  16 U.S.C. §§ 1533(b)(1)(A), (c)(2); 50 C.F.R. § 424.11.

103.    The Delisting Rule fails to analyze any of the scientific or commercial data available since the publication of the vacated rule, which was proposed in March 2006 and finalized in February 2007.  Because the decision to delist the Great Lakes wolves was not based on the best available scientific and commercial data, the Delisting Rule violates the ESA.

## COUNT II
### (Violation of the APA's Notice and Comment Requirement)

104.    Plaintiffs restate and incorporate the foregoing allegations.

26

105.    The APA requires that the agency provide notice of proposed rulemaking and opportunity for public participation.  5 U.S.C. § 553.

106.    This Court vacated the previous rule.  Then, without providing opportunity for public participation in the rulemaking, and without a finding of good cause that might excuse this failure, the FWS issued the Delisting Rule that removed protection from wolves in the western Great Lakes DPS.  As such, the public was precluded from commenting on the issues remanded by the Court and from submitting information on current threats to wolves, including relevant new information that became available only after publication of the prior delisting rule vacated by the Court.  As a consequence, the FWS has arbitrarily truncated the administrative record.

107.    By failing to provide an opportunity for public participation, the FWS's promulgation of the Delisting Rule violates the APA.

## COUNT III
### (Violation of this Court's Remand Order)

108.    Plaintiffs restate and incorporate the foregoing allegations.

109.    In vacating the previous delisting rule and remanding to the agency, this Court specifically mandated that the FWS explain its interpretation of the ESA that forms the basis of the rule.  Specifically, the Court required the agency to "address any legitimate concerns that its interpretation could undermine [the ESA's] policy objectives." *Humane Soc'y of the U.S.*, 579 F. Supp. 2d at 20-21.

110.    The Delisting Rule does not provide the required explanation, and instead relies upon a related Solicitor's opinion.  Both the Delisting Rule and the Solicitor's opinion fail to address how the FWS's interpretations could undermine the ESA's policy objectives.

111.    Because the FWS failed to adequately respond to the issues identified by the Court, the Delisting Rule violates this Court's September 29, 2008 Opinion and Order.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request the following relief:

1.    A declaration that the FWS violated the ESA and its implementing regulations, the FWS's own DPS Policy, the APA, and this Court's September 29, 2008 Opinion and Order, and that the Delisting Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

2.    An injunction preventing the FWS from implementing any aspect of the Delisting Rule;

3.    An order vacating the Delisting Rule;

4.    An order that Plaintiffs recover their costs, including reasonable attorneys' fees, incurred in connection with this action, as provided for under the ESA, 16 U.S.C. § 1540(g)(4), the Equal Access to Justice Act, 28 U.S.C. § 2412(d), or other applicable law; and

5.    Such other relief as the Court deems just and proper.

Dated: June 15, 2009

Respectfully submitted,

Ralph Henry, D.C. Bar No. 982586
rhenry@hsus.org
Jonathan R. Lovvorn, D.C. Bar No. 461163
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill, Minn. Bar No. 82521
boneill@faegre.com
Richard A. Duncan, Minn. Bar No. 192983
rduncan@faegre.com
Collette L. Adkins Giese, Minn. Bar No. 35059X,
cadkinsgiese@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

*Attorneys for Plaintiffs The Humane Society of the United States, Center for Biological Diversity, Friends of Animals and Their Environment, Born Free USA, and Help Our Wolves Live*

fb.us.3769220.02

29